**TICKETMASTER L.L.C., a Virginia limited liability company, Plaintiff,**

v.

**RMG TECHNOLOGIES, INC., a Delaware corporation, and Does 1 through 10, inclusive, Defendants.**

No. CV 07–2534 ABC (JWJx).

United States District Court, C.D. California, Western Division.

Oct. 15, 2007.

## ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

AUDREY B. COLLINS, District Judge.

Pending before the Court is Plaintiff Ticketmaster LLC's Motion for Preliminary Injunction ("Motion"), filed on August 27, 2007. Defendant RMG Technologies, Inc. ("Defendant" or "RMG") opposed on September 17, 2007, and Plaintiff replied on September 24, 2007. On October 5, 2007, Plaintiff submitted a Court-ordered supplemental declaration of Kevin McLain, and Defendant submitted a supplemental declaration of Cipriano Garibay on October 9, 2007. The hearing on this matter was held on October 15, 2007. Upon consideration of the parties' submissions, arguments of counsel, and the case file, the Court hereby GRANTS the Motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In this action, Plaintiff Ticketmaster ("Plaintiff" or "Ticketmaster") alleges that Defendant RMG has developed and marketed automated devices to access and navigate through Ticketmaster's website, thereby infringing Plaintiff's copyrights and violating the website's Terms of Use and a number of federal and state statutes.

Plaintiff Ticketmaster sells tickets for entertainment and sports events on behalf of its clients to the general public through a variety of means, including its copyrighted website ticketmaster.com ("website"). (First Amended Complaint ("FAC") ¶ 3.) Recognizing that competition to purchase tickets can be intense, Plaintiff contends that it attempts to ensure a fair and equitable ticket buying process on the website by contract and through technological means. (*Id.*) First, visitors to ticketmaster.com are required to accept contractual provisions set forth in the website's "Terms of Use." (FAC ¶¶ 16–20.) These terms permit viewers to use ticketmaster.com for personal use only, prohibit commercial use, prohibit the use of automatic devices, prohibit users from accessing ticketing pages more than once during any three second interval, and prohibit consumers from purchasing more than a specific number of tickets in a single transaction. (FAC ¶¶ 21–26; Pl.'s Exhs. 8, 9.)

Second, Plaintiff contends that it employs a number of technological means to ensure that ticket buying over the website is fair and equitable. One of these measures is a computer security program known as CAPTCHA that is designed to distinguish between human users and computer programs, and thereby prevent purchasers from using automated devices to purchase tickets. (FAC ¶ 14.)

Plaintiff contends that Defendant RMG has marketed and sold applications that enable Defendant's customers to use automated devices to enter and navigate through its website in violation of the Terms of Use governing the website, thereby causing injury to Plaintiff. (FAC ¶¶ 3–5, 17–27.) For example, Plaintiff contends that Defendant's applications are prohibited "automatic devices," that the applications circumvent Plaintiff's access control and copy protection systems, including CAPTCHA, inundate Plaintiff's

computers with thousands of automatic requests thereby preventing ordinary consumers from accessing the website, and enable Defendant's clients to purchase large quantities of tickets. (FAC ¶¶ 28–30, 34.) Based on these allegations, Plaintiff's FAC, filed on June 25, 2007, states eleven causes of action against Defendant.

■ Plaintiff now moves for a preliminary injunction based on five of its claims. Plaintiff's evidence in support of its motion includes declarations from its Senior Director of Applications Support, Kevin McLain, wherein Mr. McLain testifies how he was able to trace ticket requests and purchases made on ticketmaster.com back to individual users and, ultimately, to Defendant. Based on his methodology, McLain discovered, for example, that Chris Kovach, a ticket broker and one of Defendant's clients, purchased over 9,500 ticket orders—or 24,000 tickets—over the last several years. (McLain Decl. ¶ 24.) McLain also explains that he identified Gary Charles Bonner and Thomas J. Prior as Defendant's clients. Using IP addresses registered to Defendant, Bonner made almost 13,000 ticket purchases over several years, and made more than 425,000 ticket

requests in a single day. (*Id.*) Using IP addresses registered to Defendant, Prior made almost 22,000 ticket orders over several years, and made more than 600,000 ticket requests in a single day. (*Id.*)[1] Plaintiff also submitted declarations from Kovach; Adam Lieb, a computer and internet consultant; Steven Obara, Plaintiff's Director of Customer Service Operations; Mark Lee, an attorney representing Plaintiff in this matter; and a number of exhibits.[2]

Defendant challenges the Motion on both legal and factual grounds. Defendant states that the computer application Plaintiff seeks to enjoin Defendant from using and selling is its Ticket Broker Acquisition Tool ("TBAT"), and that this application is not an "automated device" but, rather, is simply a type of internet browser, akin to Internet Explorer, requiring human interaction. (Garibay Decl. ¶¶ 3, 4) Defendant also urges that it should not be bound by the Terms of Use and that, in any case, Plaintiff has presented no evidence upon which it-as opposed to the persons using TBAT-can be enjoined. Defendant also argues that Plaintiff's legal theories are flawed in various ways.[3]

1. Mr. McLain's Court-ordered Supplemental Declaration, filed on October 5, 2007, explains in detail, to the Court's satisfaction, the steps Mr. McLain took to trace ticket purchases to Defendant, using purchases made by Mr. Prior as an example.

2. Defendant objects to these declarations and the exhibits attached thereto on numerous grounds. The Court finds Defendant's objections meritless. Kovach, McLain, Obara, and Lee supplied sufficient foundation that their testimony is based on their personal knowledge and experience. To the extent they offered opinion testimony, they did so in conformance with the Rules of Evidence. Nor are Defendant's hearsay objections well-taken. Defendant also objects to the Lieb Declaration. However, Lieb laid a foundation sufficient to show that his testimony is based on personal knowledge, and that the opinions he offers are not "speculative" because they are

based on his examination of Kovach's computer and his experience as a computer consultant. Further, in the preliminary injunction context, the Court is not strictly bound by all rules of evidence. *See, e.g., Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination ... The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.") Thus, the Court has discretion to consider the proffered evidence even if it might not be admissible if presented in other settings.

3. The Court rejects Defendant's argument that the Motion should be denied as *premature* because it was brought prior to the Court's ruling on Defendant's Motion to Dismiss. Defendant also appears to argue, rather in-

## II. LEGAL STANDARD FOR A PRELIMINARY INJUNCTION

To obtain a preliminary injunction, a plaintiff must show "either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999). "These two alternatives represent extremes of a single continuum, rather than two separate tests." *Id.* (internal quotations omitted). "Thus, the greater the relative hardship to [a plaintiff], the less probability of success must be shown." *Id.*; *see also International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir.1993). "The district court must also consider whether the public interest favors issuance of the injunction." *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 917 (9th Cir.2003). A preliminary injunction is an "extraordinary remedy" for which the need must be "clear and unequivocal." *Shelton v. National Collegiate Athletic Ass'n*, 539 F.2d 1197, 1199 (9th Cir.1976).

## III. ANALYSIS

The five claims on which Plaintiff seeks a preliminary injunction are its claims for violation of the United States Copyright Act, 17 U.S.C. §§ 501 *et seq.*, the Digital Millenium Copyright Act ("DMCA") 17 U.S.C. § 1201, California Penal Code § 502, and the Computer Fraud and Abuse Act ("CFAA") 18 U.S.C. § 1030(g), and on its breach of contract claim.

### A. Likelihood of Success on the Merits.

#### 1. *Plaintiff's Copyright Claim*

To prevail on its claim for copyright infringement, Plaintiff must (1) "show ownership of the allegedly infringed material and (2) [it] must demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir.2001). Ticketmaster alleges that RMG is violating its copyright in the ticketmaster.com website.

Ticketmaster has submitted evidence that it owns registered copyrights in the website ticketmaster.com, and, separately, in portions of the website. (Lee Decl. ¶ 2; McLiam Decl. ¶ 5, Pl.'s Exh. 2.) "A website may constitute a work of authorship fixed in a tangible medium of expression ... Copyright protection for a website may extend to both the screen displays and the computer code for the website." *Integrative Nutrition, Inc. v. Academy of Healing Nutrition*, 476 F.Supp.2d 291, 296 (S.D.N.Y.2007). Defendant does not dispute Plaintiff's claim that its website is copyrighted. Ticketmaster has thus satisfied the first element of its copyright claim.

Ticketmaster alleges that RMG infringes its copyrights in ticketmaster.com both directly and indirectly. First, Ticketmaster states that each time Defendant views a page from ticketmaster.com, a copy of that page is necessarily downloaded or "cached" from Plaintiff's computers onto the Defendant's computer's random access memory ("RAM"), thus rendering

---

consistently, that the Motion is *untimely* because it was filed approximately three months after Plaintiff obtained the Kovach Declaration. None of the cases Defendant cites is persuasive. In view of the facts and posture of this case, the Court finds that the Motion is neither premature nor untimely. In any event, the Court did consider the motion to dismiss together with the present Motion, and issued an order on October 12 denying the motion to dismiss.

Defendant *directly liable* for such copying. (Mot. 13:9–12; McLain Decl. ¶ 4.) Plaintiff also argues that Defendant directly participates in its customers' unauthorized access of the website because its customers do not acquire physical possession of the software. Rather, Defendant's devices are kept on Defendant's own computer systems; in order to gain access to Defendant's devices, its customers must log onto Defendant's website ticketbrokertools.com, and use the devices hosted on ticketbrokertools.com to improperly access ticketmaster.com. (Pl.'s Mot. 6:18–24; Kovach Decl. 2:18–25.) Thus, Defendant allows and, indeed, requires its customers to go through its own infrastructure in order to employ the devices that access ticketmaster.com. Defendant denies this factual allegation and states that "TBAT [has never been] operated from RMG's computer system on behalf of any client, as it is not, nor has it ever, been centrally run on behalf of any client." (Garibay Decl. ¶ 5.)

Second, Plaintiff states that Defendant is liable for contributory infringement, vicarious infringement, and inducing copyright infringement because it provides its clients with bots and other automated devices to infringe Plaintiff's copyright in its website. (Mot.15:9–14.) Both direct and indirect infringement occur insofar as the person viewing the website does so in excess of the authorization Plaintiff grants through the website's Terms of Use.

### a. *Defendant's Direct Liability for Copyright Infringement*

Defendant's *direct* liability for copyright infringement is based on the automatically-created copies of ticketmaster.com webpages that are stored on Defendant's computer each time Defendant accesses ticketmaster.com. (Lieb Decl. ¶ 9.) Defendant does not contest that, as a technological question, whenever a webpage is viewed on a computer, copies of the viewed pages are made and stored on the viewer's computer. However, Defendant contends that such "cached" copies are not "copies" within the meaning of the Copyright Act, that such copies could not give rise to copyright liability because their creation constitutes fair use, and that Plaintiff has not shown that any pages from ticketmaster.com were ever downloaded or stored on Defendant's computer.

Section 101 of the Copyright Act defines "copies" as "material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101. The Copyright Act also provides that "[a] work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." *Id.*

■■ The copies of webpages stored automatically in a computer's cache or random access memory ("RAM") upon a viewing of the webpage fall within the Copyright Act's definition of "copy." *See, e.g., MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 519 (9th Cir.1993) ("We recognize that these authorities are somewhat troubling since they do not specify that a copy is created regardless of whether the software is loaded into the RAM, the hard disk or the read only memory ('ROM'). However, since we find that the copy created in the RAM can be 'perceived, reproduced, or otherwise communicated,' we hold that the loading of software into the RAM creates a copy under the Copyright Act.") *See also Twentieth Century Fox Film Corp. v. Cablevision Systems Corp.,* 478 F.Supp.2d 607,

621 (S.D.N.Y.2007) (agreeing with the "numerous courts [that] have held that the transmission of information through a computer's random access memory or RAM ... creates a 'copy' for purposes of the Copyright Act," and citing cases.) Thus, copies of ticketmaster.com webpages automatically stored on a viewer's computer are "copies" within the meaning of the Copyright Act.

 The Court must next determine whether Plaintiff has shown by a preponderance of the evidence that Defendant did in fact view the website, thereby copying its webpages. Although Plaintiff does not present direct evidence of such viewing, the logic from which such an inference may be drawn is compelling. Plaintiff presents expert testimony that Defendant necessarily had to view ticketmaster.com in order to create the applications that enable Defendant's customers to enter and navigate through the website. (Lieb Decl. ¶ 9.) Indeed, in order to test the applications to determine whether they worked as intended, Defendant would have had to actually *use* the applications to purchase tickets from the website. (*Id.*) By Defendant's own description, TBAT is "a browser geared for the purchase of tickets from a variety of websites including ... ticketmaster.com." (Garibay Decl. ¶ 5.) It also follows that Defendant's clients would have had to visit the website, and thus copy pages, in order to make ticket purchases. The Court thus finds that Plaintiff is indeed likely to prove that Defendant visited (and used) ticketmaster.com and necessarily made copies of pages from the copyrighted website.

Plaintiff also argues that Defendant is directly liable for infringement because its clients must work through Defendant's website and computer system in order to use Defendant's ticket purchasing software and thereby gain unauthorized access to ticketmaster.com. Defendant disputes this allegation. However, the Court finds it unnecessary to decide whether Plaintiff will prevail in its claim for direct infringement by showing that Defendant directly participates in its clients' conduct by acting as an intermediary for their unauthorized use of ticketmaster.com. As discussed above, Plaintiff will likely succeed in its claim for direct liability by showing that Defendant itself viewed and/or used the website.[4]

 Next, the Court will consider whether Plaintiff is likely to demonstrate that such copying constitutes copyright infringement. Plaintiff contends that Defendant infringed its copyrights by accessing and using the copyrighted website in excess of the authorization granted in the website's Terms of Use, which Plaintiff contends creates a non-exclusive license to view (and thus copy) pages from the website. Defendant presents a number of legal and factual arguments against this theory, but none of them is meritorious.

 First, the Court agrees that the Terms of Use presented on ticketmaster.com create a non-exclusive license to copy the website. "The word 'license,' means permission, or authority; and a license to do any particular thing, is a permission or authority to do that thing." *Federal Land Bank of Wichita v. Board of County Com'rs,* 368 U.S. 146, 154, 82 S.Ct. 282, 7 L.Ed.2d 199 (1961). "No magic words must be included in a document" to create a copyright license. *Radio Television Espanola S.A. v. New World Entertainment, Ltd.,* 183 F.3d 922, 927 (9th Cir.1999). Furthermore, nonexclusive li-

---

4. In addition, even accepting Defendant's version of the facts-that its clients download TBAT onto their own computers and operate it independent of Defendant-its conduct would still render it liable for contributory infringement, discussed *infra.*

censes can be implied from conduct. *See Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 558–559 (9th Cir.1990) (holding that by creating a work at defendant's request and handing it over to defendant to copy and distribute, plaintiff granted defendant an implied nonexclusive license to the work.) Use of a work in excess of a license gives rise to liability for copyright infringement. *LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150, 1156 (9th Cir.2006) ("When a licensee exceeds the scope of the license granted by the copyright holder, the licensee is liable for infringement.")

Plaintiff has presented evidence showing that access to the website is governed by specific Terms of Use, and that any person viewing the website is put on notice of the Terms of Use. For example, the ticketmaster.com homepage displays the following warning: "Use of this website is subject to express *Terms of Use* which prohibit commercial use of this site. By continuing past this page, you agree to abide by these terms." (McLain Decl. ¶ 10; Pl.'s Exh. 4.) The underlined phrase "Terms of Use" is a hyperlink to the full Terms of Use; the same phrase appears on almost every page of ticketmaster.com. (*Id.* ¶¶ 10–11; Exhs. 4–5.) In addition, since 2003, users of ticketmaster.com have had to affirmatively agree to the Terms of Use as part of the procedure to set up an account, and since mid–2006, users have had to affirmatively agree to the Terms of Use for every ticket purchase. (*Id.* ¶¶ 12, 13; Exhs. 6, 7.)

 Having determined that Plaintiff is highly likely to succeed in showing that Defendants viewed and navigated through ticketmaster.com, the Court further concludes that Plaintiff is highly likely to succeed in showing that Defendant received notice of the Terms of Use and assented to them by actually using the website. *See, e.g., Register.com, Inc. v. Verio, Inc.*, 126 F.Supp.2d 238, 248 (S.D.N.Y.2000) (where

website's terms of use stated "by submitting this query, you agree to abide by these terms," court held "there can be no question that [the user of website] manifested its assent to be bound" by the terms of use when it electronically submitted queries to the database); *Hotmail Corp. v. Van$ Money Pie Inc.*, 1998 WL 388389, *2, 6 (N.D.Cal.1998) (granting preliminary injunction based in part on breach of "Terms of Service" agreement, to which defendants had assented.) Indeed, Defendant does not contest that it was on notice of the Terms of Use; rather, Defendant argues that the Terms of Use do not amount to an agreement or a license, and that the Terms are too uncertain to be enforced. The Court finds no merit in these arguments.

The Terms of Use governing ticketmaster.com include the following terms:

"You [the viewer] agree that you are only authorized to visit, view and to retain a copy of pages of this site for your own personal use, and that you shall not duplicate, download, [or] modify ... the material on this Site for any purpose other than to review event and promotions information, for personal use ..." (Pl.'s Ex. 8 at 70).

"No .... areas of this Site may be used by our visitors for any commercial purposes ..." (*Id.* at 71.)

"You agree that you will not use any robot, spider or other automated device, process, or means to access the Site.... You agree that you will not use any device, software or routine that interferes with the proper working of the Site nor shall you attempt to interfere with the proper working of the Site." (*Id.* at 71.)

"You agree that you will not take any action that imposes an unreasonable or disproportionately large load on our infrastructure." (*Id.* at 71–72.)

"You agree that you will not access, reload or 'refresh' transactional event or ticketing pages, or make any other request to transactional servers, more than once during any three second interval." (*Id.* at 72.)

"You do not have permission to access this Site in any way that violates ... these terms of use." (*Id.* at 72.)

"You understand and agree that ... Ticketmaster may terminate your access to this Site, cancel your ticket order or tickets acquired through your ticket order ... if Ticketmaster believes that your conduct or the conduct of any person with whom Ticketmaster believes you act in concert ... violates or is inconsistent with these Terms or the law, or violates the rights of Ticketmaster, a client of Ticketmaster or another user of the Site." (*Id.* at 72.)

Viewers are thus authorized to view-and thereby copy-pages of the website when they do so in accordance with the Terms of Use. In addition, Plaintiff reserves the right to terminate any person's access to the website if it believes that person violated the Terms of Use. Thus, by the Terms of Use, Plaintiff grants a nonexclusive license to consumers to copy pages from the website in compliance with those Terms. Inasmuch as Defendant used the website, Defendant assented to the terms.

 Nor are the terms so vague as to be unenforceable. The above terms permit access for personal use only, prohibit commercial use, prohibit the use of bots and automated devices, limit the frequency with which users can make requests of the website, and require the user to agree not to interfere with the proper working of the website. Defendant argues, however, that the term "automated device" is confusing. Specifically, Defendant's President, Cipriano Garibay, a software designer, testifies in his declaration that TBAT-which he appears to claim is the only product in issue

in this case-is just a web browser and is not an "automated device" because it requires human interaction to function. (Garibay Decl. ¶ 4.) Garibay further claims that he does not know what Plaintiff is referring to by the term "automated device" because "every computer in the world, as well as all computer programs and web browsers, have [sic] a large degree of automation built in since they are not run manually. Clearly, Ticketmaster is not seeking to prohibit all computers and browsers from accessing its website, otherwise the website would be useless. However, as Ticketmaster has not defined 'automated device' in its 'Terms of Use,' I can only speculate as to what it means by same." (*Id.*)

 This claim is specious. First, the term appears in the provision in which website viewers agree to "not use any robot, spider or *other* automated device, process, or means to access the Site." (emphasis added). Although the terms of use include no additional definition of "automated device," they identify robots and spiders as examples of such devices, which Garibay states are "programs which by their very nature run without interfacing with humans." (Garibay Decl. ¶ 4.) Plaintiff has submitted credible testimony showing that Defendant's applications are, in fact, automated devices. For example, Adam Lieb, a computer consultant who studied a directory Defendant placed on Kovach's computer, testified that "the term 'automated device' is easy to understand in the context of computer programming"—a field in which Garibay claims 10 years of experience—and that TBAT is an automated device. (Lieb Reply Decl. ¶ 2; Garibay Decl. ¶ 1.) Lieb explains that even though TBAT may require human initialization or set up, the application generates automated requests thereafter. Based on his examination of the "super proxy" log

files on Kovach's computer, Lieb states that "several webpage requests per second were made to Ticketmaster, via the proxy, from the same source IP address. Thousands of requests were made per day. No human would be able to generate that many requests during manual, non-automated web browsing. These were automated request[s] made by an 'automated device.'" (Lieb Reply Decl. ¶ 4.)

Based on his personal experience, Kovach describes Defendant's software as "including automated devices that RMG calls 'workers' that can automatically navigate the Ticketmaster website.... [M]y level of service enabled me to use multiple workers-sometimes over one hundred of them-simultaneously to search for and request tickets." (Kovach Decl. ¶ 5.) Kovach further describes how he could command the workers to search for tickets according to parameters that he would set, and that the workers would search for tickets automatically and alert him when they found tickets matching his parameters. (Kovach Decl. ¶¶ 6–7, 9.) Indeed, Defendant's own website advertises its products as "let[ting] you do the work of a dozen people at once. Just enter the event information ... and the moment the event goes on sale, *PurchaseMaster* goes into action." (Pl.'s Exh. 1.) In view of all of the evidence, Plaintiff is highly likely to succeed on its claim that Defendant's applications are automated devices that violate the Terms of Use.

 However, even setting aside Plaintiff's prohibition of automated devices, the application as described would violate other provisions of the Terms of Use. For example, using an application that enables a person to make several requests per second would violate the provision limiting the frequency of requests to no more than one every three seconds. Furthermore, use of an application designed to thwart Plaintiff's access control

by, in Defendant's own description, "stealth technology [that] lets you hide your IP address, so you **never get blocked by Ticketmaster**," (Pl.'s Exh. 1) (original emphasis) would breach the user's agreement to "not use any device, software or routine that interferes with the proper working of the Site nor shall you attempt to interfere with the proper working of the Site." *See also* Kovach Decl. ¶ 8 (explaining his understanding that the "workers are specifically designed to navigate or otherwise avoid various security measures on Ticketmaster's website.")

 Finally, Defendant argues in summary fashion that to the extent Plaintiff's claim is predicated on automatically-made cache copies of Plaintiff's webpages, such cache copies constitute fair use as a matter of law under *Perfect 10, Inc., v. Amazon.com, Inc.,* 487 F.3d 701, 716 (9th Cir.2007). This argument is unavailing for several reasons. First, "[b]ecause the defendant in an infringement action has the burden of proving fair use, the defendant is responsible for introducing evidence of fair use in responding to a motion for preliminary relief." *Perfect 10,* 487 F.3d at 714. Here, Defendant has come forward with no evidence of fair use. Nor did Defendant attempt to explain how its use satisfies any of the four fair use factors set forth in 17 U.S.C. § 107. Accordingly, the fair use defense fails to defeat Plaintiff's motion on these grounds alone.

 Second, *Perfect 10* does not stand for the absolute principle of law that Defendant attributes to it. Rather, *Perfect 10* addressed, among other questions, whether users who link to infringing websites and thus make automatic cache copies of those infringing websites themselves commit copyright infringement. The Ninth Circuit agreed with the district court that such conduct was "fair use **in this context**" because the caching was

"noncommercial, transformative ... and has a minimal impact on the potential market for the original work." (*Perfect 10*, 487 F.3d at 726 (emphasis added) (quoting district court).) Significantly, the Court also noted that "a cache copies no more than necessary to assist the user in Internet use," and, in the case before it, the "background copying has no more than a minimal effect" on the plaintiff's rights. *Id.* In this context, by contrast, Defendant is not an "innocent" third-party visitor to another person's infringing site. Instead, the purpose of Defendant's viewing ticketmaster.com and the copying that necessarily entails is to engage in conduct that violates the Terms of Use in the ways described above. In addition, Defendant's use of the website is to further its own commercial objectives, that is, to create and sell ticket purchasing applications that can gain unauthorized access to ticketmaster.com. In addition, in this case, such copying has a significant, as opposed to minimal, effect on Plaintiff's rights because Defendant's conduct empowers its customers to also violate the Terms of Use, infringe on Plaintiff's rights, and collectively cause Plaintiff the harm described below. For all of these reasons, Defendant's fair use defense fails.

Because the Court finds that Plaintiff has a strong likelihood of proving that Defendant violated ticketmaster.com's Terms of Use by using automated devices, making excessive requests, and interfering with the proper working of the website when it used and/or designed applications that access ticketmaster.com, the Court finds that Plaintiff has a strong likelihood of succeeding on the merits of its claim for direct copyright infringement.

### b. *Defendant's Indirect Liability for Copyright Infringement*

■ Plaintiff also argues that it has a strong likelihood of success on its claim for *indirect* copyright infringement. The Court agrees.

■ "One infringes contributorily by intentionally inducing or encouraging direct infringement, and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930–931, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005) (citations omitted). Although "[t]he Copyright Act does not expressly render anyone liable for infringement committed by another, these doctrines of secondary liability emerged from common law principles and are well established in the law." *Id.* In *Grokster*, the Supreme Court held that "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." *Id.* at 936–937, 125 S.Ct. 2764. Evidence to support an inducement theory includes, for example "advertisement[s] or solicitation[s] that broadcast [ ] a message designed to stimulate others to commit violations." *Id.* at 937, 125 S.Ct. 2764. Here, as described above, there is substantial evidence that Defendant designed its application for the purpose of giving its clients unauthorized access to ticketmaster.com; Defendant even advertises its product as "stealth technology [that] lets you hide your IP address, so you **never get blocked by Ticketmaster**" (Pl.'s Exh. 1.) (original emphasis.) Designing and marketing a device whose purpose is to allow unauthorized access to, and thus to infringe on, a copyrighted website is sufficient to trigger contributory liability for infringement committed by the device's immediate users. *See, e.g., Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir.1996) (stating that providing the

site and facilities for known infringing activity is sufficient to establish contributory liability, and quoting with approval 2 William F. Patry, *Copyright Law & Practice* 1147, "Merely providing the means for infringement may be sufficient" to incur contributory copyright liability.)

As discussed in the Background section, Plaintiff has presented examples of Defendant's clients making numerous ticket purchases and ticket requests using Defendant's applications and resources, including the examples of Bonner making more than 425,000 requests in a single day, and Prior making more than 600,000 requests in a single day, both through IP addresses registered to Defendant. (McLain Decl. ¶ 24.) Requests so numerous cannot be made other than with automated devices. (*See* Lieb Reply Decl. ¶ 4.) Kovach testified how he used Defendant's applications to make automated ticket requests, and that Defendant made representatives available to help him use its applications, circumvent Plaintiff's security measures, and set up his hardware for optimal use. (Kovach Decl. ¶¶ 6–11.) Such uses infringe on Plaintiff's copyrights for the reasons stated above with regard to Defendant's direct infringement.

Based on this evidence, the Court finds that Plaintiff is highly likely to prove that Defendant induced or encouraged its clients' direct infringement by providing them with devices that gain them unauthorized access to and use of ticketmaster.com. Plaintiff is therefore highly likely to succeed in its claim against Defendant for contributory infringement.

### 2. *Plaintiff's Claim Under the Digital Millenium Copyright Act*

█ Plaintiff alleges that Defendant has violated the Digital Millenium Copyright Act ("DMCA"), 17 U.S.C. § 1201 *et seq.*, by trafficking in technological products, services, devices, or components that are primarily designed to circumvent Plaintiff's access control and copy protection systems. (FAC ¶¶ 51–55.) Plaintiff's Motion relies on two provisions of the DMCA.

█ First, Plaintiff claims Defendant is liable under section 1201(a)(2), which prohibits trafficking in devices designed to circumvent "technological measure[s] that effectively control[ ] access to a work protected under this title." 17 U.S.C. § 1201(a)(2). "A plaintiff alleging a violation of § 1201(a)(2) must prove: (1) ownership of a valid copyright on a work, (2) effectively controlled by a technological measure, which has been circumvented, (3) that third parties can now access (4) without authorization, in a manner that (5) infringes or facilitates infringing a right protected by the Copyright Act, because of a product that (6) the defendant either (i) designed or produced primarily for circumvention; (ii) made available despite only limited commercial significance other than circumvention; or (iii) marketed for use in circumvention of the controlling technological measure." *Chamberlain Group, Inc. v. Skylink Technologies, Inc.*, 381 F.3d 1178, 1203 (Fed.Cir.2004).

The Court finds that Plaintiff is likely to prevail on its section 1201(a)(2) claim. Specifically, as stated above, Plaintiff is likely to prove that (1) Plaintiff owns copyrights to ticketmaster.com and specific portions thereof; (2) Plaintiff employs "technological measures" such as CAPTCHA to block automated access to its copyrighted ticket purchase pages; (3) Defendant's customers are third parties who can now access those copyrighted pages; (4) these parties access those pages without Plaintiff's authorization; and (5) that this access infringes Plaintiff's rights because it entails copying those pages in excess of the third parties' license to do so; and (6)(i), (iii) these third parties have such access because of Defendant's products de-

signed primarily for circumvention, and marketed for use in circumvention of the controlling technological measure.

■ The majority of Defendant's challenges to Plaintiff's Motion on the DMCA claim are repetitive of its arguments with regard to the copyright claim, and are unavailing for the same reasons. The only unique arguments as to the DMCA claim are that CAPTCHA is not a system or a program, but is simply an image (Def.'s Opp. 17:7–8; Garibay Decl. ¶ 6), and that CAPTCHA is designed to regulate ticket sales, not to regulate access to a copyrighted work. (Def.'s Opp. 17:9–20.)

First, the Court notes that the DMCA does not equate its use of the term "technological measure" with Defendant's terms "system" or "program." In any case, Plaintiff has submitted evidence that CAPTCHA is a technological measure that regulates access to a copyrighted work. Although the DMCA does not appear to include a definition of the term, it states that "a technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C.A. § 1201(a)(3)(B). When the user makes a ticket request on ticketmaster.com, CAPTCHA presents "a box with stylized random characters partially obscured behind hash marks." (McLain Decl. ¶ 9.) The user is required to type the characters into an entry on the screen in order to proceed with the request. (*Id.*) Most automated devices cannot decipher and type the random characters and thus cannot proceed to the copyrighted ticket purchase pages. Thus, because CAPTCHA "in the ordinary course of its operation, requires the application of information ... to gain access to the work," it is a technological measure that regulates access to a

copyrighted work. Plaintiff is therefore likely to prevail on its DMCA § 1201(a)(2) claim.

■ Section 1201(b)(1) similarly prohibits the trafficking of devices primarily designed or produced for the purpose of circumventing "protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof." *See Sony Computer Entertainment America, Inc. v. Divineo, Inc.,* 457 F.Supp.2d 957, 964 (N.D.Cal.2006). Sections 1201(a)(2) and 1201(b)(1) differ only in that 1201(a)(2), by its terms, makes it wrongful to traffic in devices that circumvent technological measures that *control access to protected works,* while 1201(b)(1) makes it wrongful to traffic in devices that circumvent technological measures that *protect rights of a copyright owner in a work.* Here, CAPTCHA both *controls access* to a protected work because a user cannot proceed to copyright protected webpages without solving CAPTCHA, and *protects rights* of a copyright owner because, by preventing automated access to the ticket purchase webpage, CAPTCHA prevents users from copying those pages. For the foregoing reasons, the Court finds that Plaintiff is likely to prevail on its DMCA §§ 1201(a)(2) and 1201(b)(1) claims.

### 3. *Plaintiff's Breach of Contract Claim*

■ Plaintiff argues that Defendant is breaching the ticketmaster.com Terms of Use in numerous ways, and is therefore liable for breach of contract. (FAC ¶¶ 84–93.) The facts and issues that this claim raises are the same as those raised by Plaintiff's contention, in connection with its copyright claims, that Defendant breached the Terms of Use. The Court addressed the merits of that claim in its discussion of Plaintiff's claim for copyright infringe-

ment, and concluded that Plaintiff is highly likely to prove that use of ticketmaster.com is governed by the Terms of Use; that Defendant was on notice of, and assented to, the Terms of Use; and that Defendant violated the Terms of Use by using automated devices to access the website, using an application that makes several requests per second (in violation of the provision limiting the frequency of requests to no more than one every three seconds), and by using an application designed to thwart Plaintiff's access controls (which breaches the user's agreement to "not use any device, software or routine that interferes with the proper working of the Site nor shall you attempt to interfere with the proper working of the Site."). The Court therefore finds that Plaintiff is therefore likely to prevail on its breach of contract claim.

### 4. *Plaintiff's Computer Fraud and Abuse Act Claim*

 Plaintiff also argues that it is likely to prevail on its claim under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. Although the CFAA is a criminal statute, it permits "any person who suffers damage or loss" through a violation of its provisions "to maintain a civil action ... to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). To prevail on its CFAA claim, Plaintiff must demonstrate that Defendant "intentionally accese[d] a computer without authorization or exceed[ed] authorized access, and thereby obtain[ed] information from any protected computer," 18 U.S.C. § 1030(a)(2)(C), or that Defendant "knowingly cause[d] the transmission of a program ... and ... cause[d] damage without authorization to a protected computer." 18 U.S.C. § 1030(a)(5)(A)(i). Plaintiff must also demonstrate that Defendant's unauthorized access caused $5,000 in loss

or damage during a one year period. 18 U.S.C. § 1030(a)(5)(B)(i).

It appears likely that Plaintiff will be able to prove that Defendant gained unauthorized access to, and/or exceeded authorized access to, Plaintiff's protected computers, and caused damage thereby. Based on the statute and the cases Plaintiff cites, the Court also agrees that the required $5,000 of harm may consist of harm to a computer system, and need not be suffered by just one computer during one particular intrusion. *See, e.g., Creative Computing v. Getloaded.com LLC,* 386 F.3d 930, 934–935 (9th Cir.2004) (interpreting the CFAA). However, because Plaintiff has not quantified its harm as required by the statute or even attempted to show what portion of the harm is attributable to Defendant, the Court cannot find that Plaintiff has affirmatively shown that its harm caused by Defendant exceeds the $5,000 minimum. Thus, the CFAA claim does not provide a basis for a preliminary injunction.

In light of the Court's rulings on Plaintiff's copyright, DMCA, and breach of contract claims, the Court need not address whether Plaintiff is likely to succeed on its claims under California Penal Code § 502, the fifth basis asserted for the preliminary injunction.

### B. Irreparable Harm

 Having determined that Plaintiff has a strong likelihood of success on the merits of its copyright, DMCA, and breach of contract claims, the Court now addresses whether Plaintiff has shown "the possibility of irreparable injury." *Walczak,* 198 F.3d at 731.

 For Plaintiff's copyright claim, "a showing of a reasonable likelihood of success on the merits raises a presumption of irreparable harm." *LGS Architects, Inc. v. Concordia Homes of Nevada,* 434 F.3d 1150, 1155 (9th Cir.2006) (citing *Johnson*

*Controls,* 886 F.2d at 1174). "A copyright holder seeking a preliminary injunction is therefore not required to make an independent demonstration of irreparable harm." *Id.* at 1155–56. Here, because Plaintiff has shown a strong likelihood of success on the merits of its copyright claim, the Court presumes irreparable harm. Defendant has done nothing to rebut that presumption.

The Court also finds that Plaintiff has otherwise shown the possibility of irreparable harm required to support the issuance of a preliminary injunction on its DMCA and breach of contract claims. Specifically, Plaintiff has submitted extensive evidence demonstrating that it is suffering a loss of goodwill with the buying public in that there is a growing public perception that Plaintiff does not provide the public with a fair opportunity to buy tickets due to automated purchases. (Obara Decl. ¶¶ 4–5.) Such evidence includes numerous complaints from consumers about the unavailability of tickets, some of which demonstrate extreme dissatisfaction with Plaintiff and indicate suspicions that Plaintiff is colluding with ticket brokers to deny consumers tickets. (*Id.*; Pl.'s Exh. 19.)[5] Plaintiff has also submitted copies of consumer comments posted on blogs expressing similar extreme dissatisfaction. (Pl.'s Exh. 20)[6] and evidence of numerous news stories discussing the unavailability of tickets. (*See* Pl's. Exh. 24.) For example, many of the news sto-

ries concern the unavailability of tickets to concerts in Hannah Montana's "Best of Both Worlds" tour. Based on the reports, many parents expressed disappointed and outrage at Plaintiff because tickets to many Hannah Montana concerts throughout the nation (Bossier City, Louisiana; Miami, Florida; Atlanta, Georgia; and Kansas City, Missouri, for example) were snapped up within several hours-and sometimes within minutes-of their release for sale. It also appears that the public's difficulty obtaining tickets to the Hannah Montana concerts was so severe and created such an outcry that the Attorneys General of Missouri and Arkansas initiated investigations into Plaintiff's ticket selling practices. (*See* Pl.'s Exhs. 26, 27.)

Such evidence demonstrating public dissatisfaction with Plaintiff is properly before the Court as non-hearsay evidence. *See, e.g., Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.,* 944 F.2d 1446, 1456 (9th Cir.1991) (error for the district court not to consider newspapers article and telephone calls as evidence of actual confusion). In addition, to the extent some of the newspaper articles may be offered for a hearsay purpose, the Court has wide latitude to consider such evidence in the preliminary injunction context. *Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1363 (9th Cir.1988) (stating that it "was within the discretion of the district

---

5. Plaintiff's brief quotes several of the complaints compiled in Exhibit 19. (*See* Mot. 10, fn. 8.) One such complaint states: "I would like to know how within 20 seconds of a show going on sale I could not find ANY seats together at ANY price at this event. However, there are gobs of them for sale on many different scalper sites. How is this possible and why is this tolerated. The only explanation for this is that people inside TM are in cahoots with these criminals. I would just like to know if there are any plans whatsoever to address this situation."

6. For example, the following is a comment posted by someone who could not obtain tickets to a performance of the rock group "Rush": "I am absolutely irate about TicketBxxxxxd and its practices. As has been mentioned on this site already, the whole process of getting tickets to concerts has gotten completely out of control with scalpers, brokers, and God-knows-who-else trying to make a buck at the expense of fans." (Mot.11, fn.9.)

court to accept this hearsay for purposes of deciding whether to issue the preliminary injunction.")

Although the extent of Defendant's culpability for this harm to Plaintiff's goodwill cannot yet be determined, it is likely that some of Defendant's customers were able to obtain tickets to such concerts by using Defendant's applications. (*See* Suppl. Decl. McLain ¶¶ 4–5; Suppl. Lee Decl. ¶¶ 1–3; Exh. 23.) Given the alleged extent of Defendant's participation in the hundreds of thousands of automated ticket requests wrongfully made of Plaintiff's website, it is likely that Defendant's conduct has caused, and will continue to cause, some portion of Plaintiff's loss of goodwill unless Defendant's conduct is enjoined. As a consequence of Plaintiff's loss of consumer goodwill, Plaintiff also faces the possibility of loss of goodwill and loss of business from its clients. (McLain Reply Decl. ¶ 7.)

▮▮▮ In this Circuit, intangible injuries, such as damage to goodwill, can constitute irreparable harm. *See Rent–A–Center, Inc. v. Canyon Television and Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir. 1991); *see also, Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.,* 240 F.3d 832, 841 (9th Cir.2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *eBay, Inc. v. Bidder's Edge, Inc.,* 100 F.Supp.2d 1058, 1066 (N.D.Cal.2000) ("Harm resulting from lost profits and lost customer goodwill is irreparable because it is neither easily calculable, nor easily compensable and is therefore an appropriate basis for injunctive relief.") Plaintiff has also submitted evidence that it has attempted to use technological countermeasures to prevent automated ticket requests, but that these efforts have had only limited success. (McLain Decl. ¶¶ 23–24, 26–27, 31–33.) In addition, the cost to Plain-tiff of developing and implementing such countermeasures is not easily calculable. (*Id.*) For the foregoing reasons, the Court finds that Plaintiff has demonstrated the possibility of irreparable harm.

### C. Balance of Hardships

▮▮▮ Defendant contends that the balance of hardships tips sharply in its favor because it would go out of business if forced to stop selling TBAT. (Garibay Decl. ¶¶ 3–4.) However, in the copyright infringement context, once a plaintiff has established a strong likelihood of success on the merits, any harm to the defendant that results from being preliminarily enjoined from continuing to infringe is legally irrelevant. *See Triad Sys. Corp. v. Southeastern Exp. Co.,* 64 F.3d 1330, 1338 (9th Cir.1995) (defendant "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities."); *Cadence Design Sys., Inc. v. Avant! Corp.,* 125 F.3d 824, 830 (9th Cir. 1997) (holding that it was reversible error for a district court to even consider "the fact that an injunction would be devastating to [defendant's] business," because "where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration.") Thus, the possibility that Defendant will lose possibly all of its profits from the sale of infringing applications does not tip the hardships in Defendant's favor. Moreover, because Plaintiff has persuasively demonstrated likelihood of success on the merits of several of its claims, the balance of hardships becomes less significant to the Court's analysis. *See id.* at 830 ("The balance of hardships factor may assume significance in cases where the plaintiff has not established a strong likelihood of success on the merits, but here [the plaintiff] established that it was likely to succeed on

the merits of its copyright claim."). Therefore, to the extent to which the balance of hardships is significant in the instant case, it tips in Plaintiff's favor.

### D. Public Interest

 The Court finds that the public interest favors the issuance of a preliminary injunction. Based on the consumer complaints and news reports referenced above (*see* Pl.'s Exhs. 19, 20, 24), it is evident that Defendant's conduct not only harms Plaintiff, but also harms the public because it denies consumers the opportunity to purchase tickets to events at the face price. Thus, insofar as Defendant's misconduct allows its ticket broker clients to unfairly purchase numerous tickets for resale resulting in immediately sold-out events, ordinary consumers must either forego the event or pay ticket brokers inflated prices for resold tickets. The public interest therefore weighs in favor of an injunction.

### IV. BOND

 Federal Rule of Civil Procedure 65(c) requires Plaintiff to post a bond, in a sum the Court deems appropriate, for the payment of costs and damages that Defendant may suffer if it is later found to have been wrongfully enjoined. A bond may not be required, or may be minimal, when the harm to the enjoined party is slight or where the movant has demonstrated a likelihood of success. *See, e.g., Jorgensen v. Cassiday,* 320 F.3d 906, 919 (9th Cir.2003); *Walczak,* 198 F.3d at 733. However, the Court retains discretion to require a bond when the party seeking the injunction has not offered evidence of its own harm in posting a bond, *see Barahona–Gomez v. Reno,* 167 F.3d 1228, 1237 (9th Cir.1999).

Plaintiff asks the Court to require only a nominal bond of $1,000 because it has shown a likelihood of success. Defendant, by contrast, argues that a substantial bond of at least $10 million should be required because the injunction will put it out of business. Having considered these arguments, the Court ORDERS Plaintiff to post a **bond of $300,000,** an amount that is reasonable under the facts of this case, **within ten (10) days of the date of this Order.** Plaintiff is also ORDERED to prepare a proposed order consistent with this Order, including findings of fact and conclusions of law, **within ten (10) days of the date of this Order.**

### V. CONCLUSION

Plaintiff has persuasively demonstrated that it will likely succeed on the merits of its claims that Defendant has infringed Plaintiff's copyrights in the ticketmaster.com website, violated the Digital Millenium Copyright Act, and breached a contract (the website's Terms of Use). Plaintiff has also shown the likelihood of irreparable harm. Furthermore, the balance of hardships tips in Plaintiff's favor, not Defendant's. The public interest also favors the issuance of a preliminary injunction. Therefore, the Court hereby **GRANTS** Plaintiff's motion for a preliminary injunction and **ENJOINS** Defendant RMG Technologies, Inc., and all persons acting for its benefit or on its behalf, from:

1. Creating, trafficking in, facilitating the use of or using computer programs or other automatic devices to circumvent the technological copy protection systems in Ticketmaster's website;

2. Using information gained from access of Ticketmaster's website to create computer programs to circumvent Ticketmaster's copy protection and website regulation systems;

3. Copying or facilitating the copying of portions of Ticketmaster's website in excess of any license Ticketmaster has granted;

4. Purchasing or facilitating the purchase of tickets from Ticketmaster's website for the commercial purpose of reselling them; and

5. Otherwise accessing and using Ticketmaster's website in excess of the license granted by the Terms of Use posted thereon.